UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

WESTERN WATERSHEDS PROJECT,

Plaintiff,

v.

DANIEL ASHE, Director, and UNITED
STATES FISH AND WILDLIFE
SERVICE, an agency of the United
States,

Defendants.

Case No. 4:11-CV-00462-EJL-REB

MEMORANDUM DECISION AND
ORDER

Before the Court in the above entitled matter are Plaintiff's Motion for Summary
Judgment and Defendants' Cross-motions for Summary Judgment.   The parties have
submitted their briefing on the motions and the matters are now ripe for the Court's review.

Having fully reviewed the record herein, the Court finds that the facts and legal
arguments are adequately presented in the briefs and record.   Accordingly, in the interest
of avoiding further delay, and because the Court conclusively finds that the decisional
process would not be significantly aided by oral argument, the motions shall be decided on
the record before this Court without oral argument.

MEMORANDUM DECISION AND ORDER

**Introduction**

Plaintiff Western Watersheds Project ("Plaintiff") filed the instant action

challenging the September 30, 2010 Listing Decision ("Listing Decision") issued by

Defendants United States Fish and Wildlife Service and United States Fish and Wildlife

Service Director Daniel Ashe (collectively referred to as "the Service").   (Dkt. 1.)   The

Listing Decision determined protection of the pygmy rabbit (*Brachylagus idahoensis*) as

an endangered or threatened species was not warranted under the Endangered Species Act

("ESA"). 16 U.S.C. §§ 1531 *et. seq.*   Plaintiff seeks judicial review of the "not warranted"

finding, and asks the Court to reverse and remand the Listing Decision to the Service for a

new listing determination consistent with the requirements of the ESA.   (Dkt. 31, p. 2.)

The State of Wyoming (the "State") successfully intervened in this case as a

Defendant-Intervenor in order to defend the Service's "not warranted" determination.

(Dkt. 13.)   Plaintiff, the Service and the State have each filed cross-motions for summary

judgment, which the Court now considers.   (Dkts. 30, 33, 27.)

## I.      BACKGROUND

### 1.  Legal Background

The ESA was enacted in 1973 "to provide a means whereby the ecosystems upon

which endangered species and threatened species depend may be conserved, [and] to

provide a program for the conservation of such endangered and threatened species."   ESA

§ 2(b), 16 U.S.C. § 1531(b).   The ESA defines an "endangered species" as "any species

which is in danger of extinction throughout all or a significant portion of its range."   16

MEMORANDUM DECISION AND ORDER

U.S.C. § 1532(6).   A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."   16 U.S.C. § 1532(20).   If a species is listed as endangered or threatened, various statutory prohibitions help to protect and allow for the survival and recovery of the species.[1]   *See, e.g.*, 16 U.S.C. § 1533(d); 16 U.S.C. § 1536(a)(2); 16 U.S.C. § 1538.

Whether a particular species should be listed as either "endangered" or "threatened" is determined by the process set forth in Section 4 of the ESA.[2]   16 U.S.C. § 1533.   Under this section, the Service is required to determine whether a species is endangered or threatened "because of any" of the following five factors:

(A)      the present or threatened destruction, modification, or curtailment of its habitat or range;

(B)      overutilization for commercial, recreation, scientific, or education purposes;

(C)      disease or predation;

(D)      the inadequacy of existing regulatory mechanisms; or

---

1 The ESA delegates authority to the Secretary of Commerce (for most marine species) or the Secretary of Interior (for most terrestrial species) to determine whether to list a species as endangered or threatened.   (Dkt. 1, p. 5, ¶16.)   In this case, authority was delegated to the Secretary of Interior, who in turn delegated responsibilities under the ESA to the U.S. Fish and Wildlife Service.   50 C.F.R. § 17.2(a).

2This analysis may occur upon the Secretary's own initiative or, as in this case, in response to a petition filed by an interested person.   16 U.S.C. § 1533(b)(3)(A).   Where such a petition is filed, the Service must, "[t]o the maximum extent practicable, within 90 days after receiving the petition of an interested person…make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petition may be warranted."   *Id*.   If the Service determines the petition may be warranted, the Service must undertake a status review of the species and, within one year, issue a 12-month finding concluding whether the petition is warranted, not warranted, or warranted but precluded.   16 U.S.C. § 1533(b)(3)(B).   A finding that a listing is not warranted, like that in this case, is subject to judicial review.   16 U.S.C. § 1533(b)(3)(C)(ii).

MEMORANDUM DECISION AND ORDER

(E)        other natural or manmade factors affecting its continued existence. 16 U.S.C. § 1533(a)(1)(A)-(E).

Although the Service considered all five of the above factors in the Listing Decision, Plaintiff's Complaint challenges only certain aspects of the Service's assessment of Factor A-"the present or threatened destruction, modification, or curtailment of [the species'] habitat or range." (Dkt. 1, pp. 12-15, ¶¶44-55.)   The parties' dispute on review accordingly centers on the Service's assessment of Factor A.

The ESA requires that the decision of whether to list a species must be founded "solely on the basis of the best scientific and commercial data available to [the Service] after conducting a review of the status of the species…[.]"   16 U.S.C. § 1533(b)(1)(A). An agency's determination of what constitutes the "best available science" is accorded substantial deference.   *San Luis & Delta-Mendota Water Auth. v. Salazar*, 760 F.Supp.2d 855, 871 (E.D. Cal. 2010).   The Service is also required to consult with affected states when considering whether to list a species as endangered or threatened, and to "tak[e] into account those efforts…being made by any State…to protect such species" under existing "conservation practices."   16 U.S.C. § 1533(b)(1)(A).

If the Service finds that listing is warranted, it must publish a proposed listing regulation in the Federal Register.   *Id*. at § 1533(b)(3)(B)(ii).   The Service must either publish in the Federal Register a final regulation listing the species, or withdraw the proposed listing, within one year of publishing a warranted finding.   *Id*. at § 1533(b)(6)(A).   Designation of critical habitat for the listed species must accompany or

MEMORANDUM DECISION AND ORDER

soon follow a final listing regulation.   *Id*. at § 1533(b)(6)(C).   The ultimate goal of the

ESA is to recover listed species to the point where they no longer need ESA protection.

*Id*. at §1531(b)-(c); § 1532(3).

### 2.  The Pygmy Rabbit

The following facts are taken from the Listing Decision and do not appear to be

disputed by the parties.   The pygmy rabbit is the smallest member of the family Leporidae

(rabbits and hares) in North America.   (Administrative Record ("AR") p. 2.)   The weight

of an adult pygmy rabbit ranges from 0.54 to 1.2 pounds, and the length ranges from 9.1 to

12.1 inches.   (*Id*.)   The species can be distinguished from other rabbits by its small size,

gray color, short rounded ears, small hind legs, and by the absence of white on its tail.

(*Id*.)

Pygmy rabbits are typically found in areas of tall, dense sagebrush cover and are

considered a sagebrush obligate species because they are highly dependent on sagebrush to

provide both food and shelter throughout the year.   (*Id*.)   The winter diet of a pygmy

rabbit is composed of up to 99 percent sagebrush, which is unique among leporids.   (*Id*.)

In Idaho, the pygmy rabbit's spring and summer diet was found to consist of approximately

51 percent sagebrush, 39 percent grasses, and 10 percent forbs.   (*Id*.)

The pygmy rabbit is one of two rabbits in North America that digs its own burrows.

(*Id*.)   These burrows are typically found in relatively deep, loose soils of wind-borne or

water-borne origin.   (*Id*.)   Pygmy rabbits, especially juveniles, likely use burrows for

protection from predators and inclement weather.   (*Id*.)   Pygmy rabbits are relatively

MEMORANDUM DECISION AND ORDER

slow and vulnerable in more open areas, and evade predators by maneuvering through the dense shrub cover of their preferred habitat or by escaping to their burrows.   (*Id.*)   Due to their specialized habitat requirements, pygmy rabbits are not evenly distributed across their range.   (*Id.* at 4.)   They are found in areas within their broader distribution where sagebrush cover is sufficiently tall and dense, and where soils are sufficiently deep and loose to allow burrowing.   (*Id.*)

After initial declines, pygmy rabbits may not have the same capacity for rapid increases in numbers that characterize other species.   (*Id.*)   This may be due to their close association with specific components of sagebrush ecosystems, and the relatively limited availability of their preferred habitats.   (*Id.*)   No study has documented rapid increases in pygmy rabbit numbers in response to environmental conditions.   (*Id.*)   Nor are long term population monitoring studies available to indicate whether population fluctuations or cycles occur for pygmy rabbits or if seasonal or other habitat shifts or movements have been misinterpreted as declines.   (*Id.*)   The annual mortality rate of adult pygmy rabbits may be as high as 88 percent, and more than 50 percent of juveniles can die within roughly 5 weeks of birth.   (*Id.*)   Predation is the main cause of pygmy rabbit mortality.   (*Id.*)

The general historical and current geographic range of the pygmy rabbit includes portions of eight states, including Idaho, Nevada, Utah, Wyoming, Oregon, and sections of Washington (the Columbia Basin area), Northeastern California, and Southwestern Montana.   (*Id.* at 4-5.)   To determine the historical and current distribution of pygmy rabbits in these areas (excluding the Columbia Basin area in Washington, where the pygmy

MEMORANDUM DECISION AND ORDER

rabbit is already listed as endangered), the Service reviewed published scientific peer-reviewed literature; unpublished agency documents; dissertations; theses; databases maintained by State heritage programs, State wildlife agencies, and Federal agencies; survey data sheets; museum records; electronic mail records; and agency notes to the files. (*Id*.)

The Service also undertook a large-scale, range-wide analysis of Service databases documenting surveying records of pygmy rabbits across its traditional habitat. (*Id*. at 8.) The Service ultimately concluded pygmy rabbit activity continues to occur in Oregon, Idaho, Montana, Wyoming, Nevada, and Utah, in a similar distributional pattern as compared with historical information.   (*Id*. at 8-15.)   Although it found the pygmy rabbit may have suffered range contraction in portions of its historical range in Northeastern California, the Service ultimately determined pygmy rabbits continue to occur throughout their historical range, as well as in newly discovered sites in all seven states where pygmy rabbit activity has been detected.   (*Id*. at 4, 16, 32, 43-44.)

### 3.   Procedural Background

This case represents the fourth round of litigation before this Court regarding the Service's consideration of whether the pygmy rabbit should be listed as an endangered or threatened species under the ESA.   In November 2001, the Service issued an emergency rule protecting the pygmy rabbit as an endangered species in the Columbia Basin Distinct

Population Segment ("DPS"), located in the Columbia Valley region of Washington.[3] (Dkt. 1, p. 9, ¶33.)   In this rule, the Service acknowledged concerns over the declining populations of pygmy rabbits across its historic range, and planned a status review of the pygmy rabbit to determine whether it required range-wide protection under the ESA.   (*Id*.)

In March, 2003, the Service issue a new, final rule protecting only the Columbia Basin DPS pygmy rabbits as endangered.   (*Id*., ¶34.)   On April 21, 2003, Plaintiff submitted a "Listing Petition" to the Service, requesting that the Service list the pygmy rabbit as endangered or threatened in all remaining populations outside of the Columbia Basin DPS.   (*Id*., p. 10, ¶36.)   The Service initially failed to respond to Plaintiff's Listing Petition within the timelines required under the ESA.   (*Id*., ¶38.)   Plaintiff accordingly sued the Service on August 31, 2004 to enforce compliance with the ESA.   *See Western Watersheds Project et. al. v. U.S. Fish and Wildlife Service*, No. 04-cv-440-BLW (D. Idaho).   (*Id*.)   The parties reached a settlement requiring the Service to submit for publication in the Federal Register a 90-day Finding on Plaintiff's Listing Petition by May 16, 2005, and, if appropriate, a 12-month Finding by February 15, 2006.   (*Id*., p. 11, ¶39.)

The Service's requisite 90-day Finding, published on May 20, 2005, concluded that Plaintiff's Listing Petition failed to provide substantial scientific or commercial information to demonstrate that listing the pygmy rabbit under the ESA may be warranted. (*Id*., ¶40.)   Plaintiff again sued the Service, seeking judicial review of the Service's

---

3 The Service may designate a DPS to avoid listing an entire species as endangered, where only a portion of a species' population warrants protection under the ESA.   16 U.S.C. § 1532(16).

MEMORANDUM DECISION AND ORDER

determination.   *See Western Watersheds Project v. Norton*, No. 06-cv-0127-EJL (D. Idaho).   This Court held that the Service's 90-day Finding improperly imposed a higher standard for scientific and commercial information than that required under the ESA when it denied Plaintiff's Listing Petition.   2007 WL 2827375 (D. Idaho 2007) at *6.   As such, this Court reversed the Service's 90-day Finding as arbitrary and capricious, and remanded the decision back to the Service to issue a new decision within 90 days.   *Id*. at *9.

In January 2007, the Service issued a new 90-day Finding concluding that protection of the pygmy rabbit under the ESA may be warranted.   73 Fed. Reg. 1312 (January 8, 2007).   Rather than issuing a 12-month Finding within one year as required under the ESA, the Service had failed to issue any finding by February of 2010.   Plaintiff again sued the Service for violating the ESA.   *See Western Watersheds Project v. U.S. Fish and Wildlife Service*, No. 10-cv-000544-REB (D. Idaho).   The parties reached a settlement requiring the Service to issue a mandatory 12-month Finding no later than September 24, 2010.   (Dkt. 1, p. 11, ¶43.)

On September 30, 2010, the Service published the Listing Decision at issue in this case.   75 Fed. Reg. 60516-561.   In the Listing Decision, the Service concluded that listing the pygmy rabbit as an endangered or threatened species under the ESA was not warranted. Plaintiff filed the instant action to seek judicial review of the Service's "not warranted" finding.

MEMORANDUM DECISION AND ORDER

## II.     STANDARD OF REVIEW

Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).   However, in a case involving review of a final agency action under the Administrative Procedures Act ("APA"), the court's role is limited to reviewing the administrative record, and the standard set forth in Rule 56 does not apply.   *Colorado River Cutthroat Trout v. Salazar*, 898 F.Supp.2d 191, 200 (D.D.C. 2012) (citing *Catholic Health Initiatives v. Sebelius*, 658 F.Supp.2d 113, 117 (D.D.C. 2009), *rev'd on other grounds*, 617 F.3d 490 (D.C. Cir. 2010)). "Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'"   *Id*. (citation omitted).   Summary judgment is thus "the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."   *Id.* (citation omitted); *see also Northwest Motorcycle Ass'n v. U.S. Dep't. of Agric*. 18 F.3d 1468, 1471-72 (9th Cir. 1994). Compliance with the ESA is reviewed under the APA.   5 U.S.C. § 701 *et. seq*.; *Karuk Tribe of California v. U.S. Forest Serv*., 681 F.3d 1006, 1015 (9th Cir. 2012).   Under the APA, an agency action must be upheld unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."   *Id*.; 5 U.S.C. § 706(2)(A).

MEMORANDUM DECISION AND ORDER

The party challenging an agency's action as arbitrary and capricious bears the burden of proof.   *WildEarth Guardians v. Salazar*, 741 F.Supp.2d 89, 97 (D.D.C. 2010) (citation omitted).

To decide if an agency action is arbitrary and capricious, the court must determine whether the agency "considered the relevant factors and articulated a rational connection between the facts found and the choices made."   *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 954 (9th Cir. 2003) (*citing Washington Crab Producers, Inc. v. Mosbacher*, 924 F.2d 1438, 1441 (9th Cir. 1990).   If the agency decision was based on the relevant factors and there is no clear error of judgment, the reviewing court may not overturn the agency's action as arbitrary and capricious.   *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989).

Review of agency actions is "highly deferential," "presume[es] the agency action to be valid," and requires that the Court affirm the agency action "if a reasonable basis exists for its decision."   *Northwest Ecosystem Alliance v. U.S. Fish and Wildlife Serv*., 475 F.3d 1136, 1140 (9th Cir. 2007) (citation omitted).   The court is not to substitute its judgment for that of the agency, and deference to the agency's technical expertise and experience is particularly important with respect to questions involving scientific matters. *Id*.; *see also Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir. 1993) (citation omitted). However, "the presumption of agency expertise may be rebutted if the decisions, even though based on scientific expertise, are not reasoned."   *Greenpeace v. National Marine Fisheries Service*, 80 F.Supp.2d 1137, 1147 (W.D. Wash. 2000).

MEMORANDUM DECISION AND ORDER

# III.   ANALYSIS

Plaintiff claims the Listing Decision is arbitrary and capricious for four reasons.

First, Plaintiff argues that, under the ESA, a species must be designated as "threatened" if it

"is likely to become an endangered species within the foreseeable future," and that the

Service failed to define the "foreseeable future" with respect to the pygmy rabbit.   Second,

the Service is required to list a species as endangered or threatened if it warrants protection

"throughout all or a significant portion of its range." 16 U.S.C. §§ 1532(6), (20).   Plaintiff

argues the Service adopted an entirely new test for determining whether the pygmy rabbit

was threatened or endangered across a "significant portion of its range" than that used by

the Service traditionally, and that the Service, in violation of the APA, failed to articulate

any explanation for deviating from its prior methodology.   Third, Plaintiff argues that the

Service failed to consider whether areas the pygmy rabbit no longer occupies within its

historic range constitute a significant portion of its range.   Finally, Plaintiff claims the

Service violated the ESA by failing to assess or consider the combined or cumulative effect

of the recognized threats to pygmy rabbits, and instead only considered such threats in

isolation.   Plaintiff requests that the Court reverse and remand the Listing Decision to the

Service, and that the Court require the Service to issue a new Listing Decision within a

maximum of twelve months.

The Service and the State argue that the Service considered the relevant factors and

applied the appropriate tests when rendering the Listing Decision.   With respect to the

aforementioned four areas to which Plaintiff assigns error, Defendants argue; (1) the best

MEMORANDUM DECISION AND ORDER

available science did not allow the Service to reliably predict the foreseeable future and, therefore, the Service could not define the foreseeable future; (2) the Service applied the traditional analysis for determining whether the pygmy rabbit is endangered throughout a significant portion of its range, but simply removed boilerplate language from its use of the traditional test; (3) the Service was not required to conduct a lost historical range analysis because it concluded there has been little to no pygmy rabbit range contraction; and (4) the Service appropriately considered potential threats to the pygmy rabbit both singularly and in combination.   The Service and the State also emphasize that the Service's decision is entitled to significant deference and that Plaintiff cannot meet the high threshold required to establish that the Service's finding should be set aside as arbitrary and capricious.

Having carefully considered each of Plaintiff's arguments, the Court is not persuaded that the Service's decision not to list the pygmy rabbit as endangered or threatened under the ESA was arbitrary and capricious.   As the Supreme Court has stated, "[t]he task of defining and listing endangered and threatened species requires an expertise and attention to detail that exceeds the normal province of Congress," as well as that of the courts.   *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 708 (1995).   This Court may not substitute its judgment for that of the Service and can only hold the Service to "certain minimal standards of rationality."   *Ethyl Corp. v. Environmental Protection Agency*, 541 F.2d 1, 36 (D.C. Cir. 1976).   Accordingly, and for the reasons set forth below, the Court finds that the Listing Decision represents a reasoned

MEMORANDUM DECISION AND ORDER

exercise of the Service's discretion based on the facts and the best science available to the Service at the time it made its decision.

**1.   Jurisdiction**

As a preliminary matter, the Service contends that this Court only has jurisdiction over Plaintiff's arguments with respect to the Service's significant portion of the range analysis, and not over Plaintiff's challenge to the Service's failure to define foreseeable future or to consider cumulative threats to the pygmy rabbit.   (Dkt. 39, pp. 1-2, n. 1.)   The Service claims the Court lacks jurisdiction to review the latter two challenges because Plaintiff's Notice of Intent to Sue ("NOI") did not assert that the Service violated the ESA by failing to define the foreseeable future or by failing to conduct a cumulative threats analysis.   (*Id.*)   Because Plaintiff's NOI (Dkt. 39-1) allegedly claims only that the Service failed to consider the best available science and used the wrong test for analyzing the significant portion of the range, the Service argues this Court's analysis should accordingly be limited to Plaintiff's significant portion of range argument.

Pursuant to 16 U.S.C. § 1540(g) of the ESA, a citizen must give written notice of an alleged violation to the Secretary and to the alleged violator sixty days prior to bringing suit.   The sixty-day notice requirement is jurisdictional.   *Save the Yaak Comm. v. Block*, 840 F.2d 714, 721 (9th Cir. 1988).   Failure to strictly comply with the notice requirement "acts as an absolute bar to bringing suit under the ESA."   *Southwest Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998) (citation omitted).   The purpose of the sixty-day notice provision "is to put the agencies on notice

MEMORANDUM DECISION AND ORDER

of a perceived violation of the statute and an intent to sue.   When given notice, the

agencies have an opportunity to review their actions and take corrective measures if

warranted.   The provision therefore provides an opportunity for settlement or other

resolution of a dispute without litigation."   *Id*. (*quoting Forest Conservation Council v.*

*Espy*, 835 F.Supp. 1202, 1210 (D. Idaho 1993)).

      In this case, however, Plaintiff's claims each relate to the overall Listing Decision,

and, as such, are challenges to the Service's exercise of discretion.   Claims relating to the

Service's discretionary duties are subject to judicial review under the APA—not the ESA.

*Federation of Fly Fishers v. Daley*, 200 F.Supp.2d 1181, 1186 (N.D. Cal. 2002).   Unlike

the ESA, the APA does not require advance notice prior to bringing suit.   *State of Maine v.*

*Norton*, 257 F.Supp.2d 357, 376 (D. Me. 2003).   Listing Decisions "involve the exercise

of some discretion," and challenges, like Plaintiff's in this case, that allege an abuse of

discretion, "cannot be brought under the ESA's citizen suit provision, which applies only

to the performance of nondiscretionary duties."   *Id*. (citing 16 U.S.C. § 1540(g)(1)(C).

      To the extent Plaintiff's foreseeable future and cumulative threats arguments relate

to the Service's discretionary duty to consider such factors, such claims are brought under

the APA and do not require advance notice.   As a result, Plaintiff's alleged failure to

identify such challenges in its NOI does not deprive the Court of jurisdiction over such

claims.   *Western Watersheds Project v. Fish and Wildlife Service*, 535 F.Supp.2d 1173,

1183 (D. Idaho 2007) (noting that all ESA listing decisions are reviewed under the APA's

MEMORANDUM DECISION AND ORDER

arbitrary and capricious standard, and, consequently, the ESA notice requirement does not apply).

Further, even if the Service's consideration of foreseeable future and cumulative threats was considered non-discretionary under the ESA, the Court finds Plaintiff's NOI adequately identifies such claims.   Although Plaintiff's NOI does not specifically reference the Service's failure to define foreseeable future or to consider cumulative threats, an NOI is sufficient where the notice letter identifies the agency action at issue, the species at issue, the provisions of the ESA at issue, and the location of the asserted violation.   *Southwest Ctr. for Biological Diversity*, 143 F. 3d at 520-22 (stating, "at a minimum" notice requires sufficient information of a violation so that agency can "identify and attempt to abate the violation" and finding notice insufficient where plaintiff failed to identify specific species, geographic location, and the action alleged to be unlawful).

Plaintiff's NOI identifies the Service's September 30, 2010 Listing Decision as the agency action at issue and cites to the publication of the Listing Decision in the Federal Register, 75 Fed.Reg. 60516.   (Dkt. 39-1, p. 1.)   Plaintiff's NOI also specifically identifies the pygmy rabbit as the species at issue, as well as 16 U.S.C. § 1532(6) and (20) (definition of endangered and threatened species), 16 U.S.C. § 1533(a)(1) (criteria for making listing decisions), and 16 U.S.C. §1533(b)(1)(A) (best available science requirement), as the provisions of the ESA at issue.   By referencing the Listing Decision, Plaintiff's NOI also includes the location of the asserted violation by implication, as the September 30, 2010 Listing Decision is specifically limited to the seven-state pygmy rabbit

MEMORANDUM DECISION AND ORDER

range (excluding the Columbia Basin DPS) of California, Idaho, Montana, Nevada, Oregon, Utah and Wyoming.

Moreover, in addition to identifying the required elements of the agency action, species, and provisions of the ESA at issue, as well as the location of the violation, Plaintiff's NOI also references its foreseeable future argument by specifically challenging the Service's conclusion that the "pygmy rabbit does not meet the definition of…threatened under Section 4 of the Endangered Species Act." (Dkt. 39-1, p. 1.)

Because a species is considered "threatened" if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," Plaintiff's objection to the Service's finding that the pygmy rabbit is not threatened necessarily implicates the Service's determination that the rabbit is not likely to become endangered within the foreseeable future.   16 U.S.C. § 1532(20).   Plaintiff's NOI also referenced its cumulative threats argument in the NOI by stating "the Service ignored or downplayed available scientific information showing that the threats to pygmy rabbit habitat are real and increasing, including fire, energy development and infrastructure, non-native weeds, livestock grazing, sagebrush conversion, agricultural conversion, and other threats."   (*Id*. at 2.)   The Court accordingly finds that Plaintiff's NOI satisfied the notice requirements of 16 U.S.C. § 1540(g) and identified alleged errors in the Listing Decision with sufficient particularity to confer jurisdiction over such alleged errors to this Court.


MEMORANDUM DECISION AND ORDER

### 2.   Foreseeable Future

Plaintiff's first challenge to the Listing Decision involves the Service's determination that the pygmy rabbit is not threatened.   As noted, the ESA defines "threatened" as "likely to become an endangered species within the *foreseeable future* throughout all or a significant portion its range."   16 U.S.C. § 1532(20) (emphasis added). Because the Service did not define the "foreseeable future" with respect to the pygmy rabbit, Plaintiff contends the Service's conclusion that the pygmy rabbit is "not likely to become endangered within the foreseeable future" is arbitrary and capricious.

Judicial review of an agency's interpretation of a statute is governed by the two-part formula announced by the Supreme Court in *Chevron USA, Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837, 842 (1984) ("*Chevron*").   Under the first part of the *Chevron* test, the court must ask "whether Congress has directly spoken to the precise question at issue."   *Id*.   If Congress has addressed the question at issue, the statute is unambiguous and the Court "must give effect to the unambiguously expressed intent of Congress" regardless of the agency's view.   *Id*. at 843.   However, if the statute is silent on the matter, or ambiguous with respect to the specific issue, then the court must defer to the agency's interpretation unless that interpretation is unreasonable.   *Id*. at 843-44.

Neither the ESA nor the applicable regulations define the term "foreseeable future." As such, the statute is ambiguous and the court must defer to the Service's interpretation unless that interpretation is unreasonable.   *Id*.   The *Chevron* test established a

MEMORANDUM DECISION AND ORDER

"presumption that Congress, when it left ambiguity in a statute meant for implementation

by an agency, understood that the ambiguity would be resolved, first and foremost, by the

agency, and desired the agency (rather than the courts) to possess whatever degree of

discretion the ambiguity allows."[4]   *National Cable & Telecommunications Ass'n v. Brand*

*X Internet Serv.*, 545 U.S. 967, 982 (2005) (internal quotations and citation omitted).

Here, Defendants do not dispute that the Service failed to define "foreseeable

future" within the pygmy rabbit Listing Decision.   *See, e.g., Service's Response to*

*Plaintiff's Cross-Motion for Summary Judgment* (Dkt. 39, p. 21) (stating, "FWS did not

'define' the foreseeable future in the Finding"); *State's Response to Plaintiff's*

*Cross-Motion for Summary Judgment* (Dkt. 41, pp. 15-16) (noting "[i]n the end, the

Service did not provide a definition of the term 'foreseeable future' in its published

finding.").   Both the Service and the State instead argue the Service could not define

"foreseeable future" because the Service lacked sufficient data (such as population data or

data establishing a link between population trends and potential threats) to develop reliable

predictions about the future.   (Dkt. 39, pp. 16-23; Dkt. 41, pp. 13-17.)   Thus, Defendants

contend the Service could not define "foreseeable future" because any definition would be

---

4   That Congress intended the Service to maintain significant discretion with respect to interpreting
"foreseeable future" is buttressed by the legislative history of the ESA.   Specifically, in a hearing
on the proposed bills that led to the passage of the ESA, Senator Stevens pressed officials from the
Department of Interior for criteria that should be used to determine foreseeable future.   The
officials declined to provide such criteria, maintaining that it would be difficult or impossible to
write such criteria into the law.   Instead, the officials noted that the Department would have to
rely on the best scientific judgment to interpret "foreseeable future."   *Endangered Species Act of
1973: Hearings on S. 1592 and S. 1983 Before the Senate Subcomm. on the Environment of the
Committee on Commerce*, 93rd Cong. 51, 58-59, 61, 63, 66 (1973).

MEMORANDUM DECISION AND ORDER

based on an arbitrary "timeframe that lacked a scientific basis." (Dkt. 39, p. 16; Dkt. 41, p. 16.)   Plaintiff counters that there is no authority that permits the Service to sidestep its obligation to define "foreseeable future in a listing decision merely because there is uncertainty about a species' population trends."   (Dkt. 46, p. 6.)   Plaintiff argues the Service's failure to define foreseeable future constitutes reversible error.   (*Id.*) (*citing W. Watersheds Project v. Foss*, 2005 WL 2002473 (D. Idaho 2005) and *Otter v. Salazar*, 2012 WL 3257843 (D. Idaho 2012)).

In support of their arguments with respect to "foreseeable future," Plaintiff and the Defendants rely upon an opinion drafted by the Solicitor for the Department of the Interior regarding the appropriate interpretation of the term.   *See Solicitor's Memorandum on the Meaning of 'Foreseeable Future' in Section 3(20) of the ESA, M-37021* (Jan. 16, 2009) ("*M-Opinion*").   In that opinion, the Solicitor explained the inherent difficulties in reliably predicting "foreseeable future" for each species and stressed that "the foreseeable future extends only so far as the Secretary can explain reliance on the data to formulate a reliable prediction.   What must be avoided is reliance on assumption, speculation, or preconception."   *Id.*, at 8.   Defendants' suggest the *M-Opinion* supports their position because the Service avoided speculating or arbitrarily defining "foreseeable future" where it lacked the population and threat trend data required to reliably predict the "foreseeable future" for the pygmy rabbit.   Plaintiff counters that the *M-Opinion* approved alternate, qualitative techniques to interpret "foreseeable future" where the available data does not

MEMORANDUM DECISION AND ORDER

allow for precise quantification, and that the Service arbitrarily and capriciously failed to use such qualitative methods to define "foreseeable future."

The *M-Opinion* supports the Service's approach to "foreseeable future." For instance, the Service initially utilized a method for determining the status of a species published by the International Union for Conservation of Nature ("IUCN") in its Red List of Threatened Species.   (AR 4678.)   The IUCN uses the time frame of three generations of the species, or ten years (whichever is greater) to determine whether a species is likely to become endangered in the future.   (*Id*.)   The Service initially evaluated the "foreseeable future" for the pygmy rabbit as ten years, because ten years is slightly longer than three pygmy rabbit generations.   (*Id*.)   However, the *M-Opinion*, issued five months before the Service conducted its analysis, counseled against relying upon the IUCN method, explaining, the Service "is implementing a specific mandate from Congress (the ESA) and is authorized to act only consistent with that mandate and with generally applicable standards of rational decisionmaking.   The IUCN assessment process is neither tethered to a particular statutory mandate nor subject to the standards of administrative law; the IUCN has created its own standards, and they are not identical to those of the ESA."   *M-Opinion*, at 15.

The Service thus concluded the ten year time frame represented solely a "default" period lacking scientific basis and changed its analysis to consider historical data on the pygmy rabbit in attempt to identify relevant trends that would generate reliable future predictions.   (AR 2957-8.)   However, the Service determined that it lacked scientific
MEMORANDUM DECISION AND ORDER

data "to predict the direction of trends into the future."   (AR 2958.)   The Service also

attempted to consider "the ongoing effects of current risk factors and threats at comparable

levels to current threats."   (*Id.*)   Because it lacked "sufficient scientific data to identify a

clear timeframe for specific threats," the Service ultimately found it could not make

reliable predictions regarding "foreseeable future."   (*Id.*; *see also* AR 76334) ("Our ability

to assess current threats is limited, and we have no empirical basis with which to predict the

direction of trends into the future.").

Although Plaintiff suggests the *M-Opinion* outlined alternative, qualitative methods

the Service could have used for estimating "foreseeable future," such methods require an

"extrapolation of population or threat trends, analysis of how threats will affect the status

of the species, or assessment of future events that will have a significant new impact on the

species."   *M-Opinion*, at 1.   However, as the record illustrates, the Service did not have

data to allow it to identify "threat trends" or to extrapolate such trends into the future.   (AR

2957-58.)   The Service could not use the alternative methods suggested by the Solicitor

where it lacked the scientific information required to employ such methods.

Under the ESA, the Service is required to base its listing decision "solely on the

basis of the best scientific and commercial data available….."   16 U.S.C. § 1533(b)(1)(A).

The best available data requirement of 16 U.S.C. § 1533(b)(1)(A) requires "not only that

data be attainable, but that researchers have in fact conducted the tests."   *American

Wildlands v. Kempthorne*, 530 F.3d 991, 998 (D.C. Cir. 2008).     In the absence of

available evidence, the ESA does not require an agency to conduct its own studies to

MEMORANDUM DECISION AND ORDER

determine whether to list a species as endangered or threatened.   *Id*.   The best available science requirement is designed to "ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise."   *Bennett v. Spear*, 520 U.S. 154, 176 (1997).

In *Southwest Cntr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 61 (D.C. Cir. 2000), the D.C. Circuit reviewed the district court's finding that the available evidence regarding the Service's decision not to list the Queen Charlotte goshawk was "inconclusive." Because data was inconclusive, the district court held the Service was required to find better data on the species' abundance and remanded the listing decision to the Service, directing it to conduct an on-site count of the goshawk population.   The D.C. Circuit reversed, emphasizing that, although "the district court's view has superficial appeal…this superficial appeal cannot circumvent the statute's clear wording: The secretary must make his decision as to whether to list a species as threatened or endangered 'solely on the basis of the best scientific and commercial data available to him.'"   *Id*. at 61 (internal quotation and citation omitted).   The D.C. Circuit significantly held, "the 'best available data' requirement makes it clear that the Secretary has no obligation to conduct independent studies," and reversed the district court.   *Id*. at 60.   In so holding, the Court stated, "the district court was without authority to order the Secretary to conduct an independent population count of the birds."   *Id*. at 59.   The Court further explained that the district court was required to assess the agency's evidence and resolve the parties' dispute, and that it could not "sidestep this responsibility by imposing an obligation upon the Secretary to find better data." *Id*. at 61.

MEMORANDUM DECISION AND ORDER

In this case, both the record and the Listing Decision demonstrate that the Service could not define "foreseeable future" in light of the best available data.   The Service's assessment of the "foreseeable future" is "typically based on the timeframes over which the best available scientific data allow [the Service] to reliably assess threats and the species' response to those threats, and is supported by species-specific factors, including the species' life history characteristics and population dynamics."   (AR 2956; AR 4678).   An important aspect in assessing "foreseeable future" is the consideration of trends, which are "normally assessed in terms of distribution, abundance, or habitat."   (AR 2957.).

The Listing Decision makes clear that population trend data typically used to assess foreseeable future was simply not available for the pygmy rabbit.   For instance, the Listing Decision notes that "[p]opulation cycles are not known in pygmy rabbits," and that "[l]ong-term population monitoring studies are not available indicating whether population fluctuations or cycles occur for pygmy rabbits or if seasonal or other habitat shifts or movements have been misinterpreted as declines."   (AR 4).   The Listing Decision also explains:

Survey efforts have focused on location of pygmy rabbit signs rather than on documenting known or perceived threats to the species at these sites.   Rarely has revisiting of sites occurred with the purpose of monitoring populations over time.   While we consider this information of limited use to our finding due to its local, short-term nature, it is the best scientific information to conduct our analysis.

(*Id.* at 5).

The Listing Decision also states that the Service "was unaware of any historical or current population estimates being made for the pygmy rabbit by individual States or for

MEMORANDUM DECISION AND ORDER

the range considered in this finding." (*Id*. at 15.)   And, although it considered reports

collected by individuals on pygmy rabbit abundance throughout the rabbit's range, the

Listing Decision emphasizes:

…next to actual sightings of pygmy rabbits, burrow systems and pellets are the most
reliable evidence of pygmy rabbit presence in an area; together they may provide an
indirect index of population trend but depend on the objectives of the investigator as
multiple factors can affect changes in pellets and burrows over time.   Therefore, reliably
estimating the abundance of pygmy rabbits on a statewide or range wide basis is not
currently possible.
*Id*.

The Listing Decision further explains:

Population trends are normally defined in terms of distribution or abundance.   In the case
of the pygmy rabbit, the available scientific information does not allow for an analysis of
abundance over time.   Abundance trends for the pygmy rabbit in each State and
throughout its range are unknown and how impacts to the sagebrush habitat from various
events or actions have affected the pygmy rabbit remain unclear.
*Id*.

The Listing Decision thus illustrates the shortcomings of available population data.

Although the Listing Decision does not specifically state that the Service could not

adequately define "foreseeable future" in light of such shortcomings, the Court finds this

conclusion is apparent from the record.   Specifically, the record demonstrates that the

Service had incomplete data for the pygmy rabbit with respect to distribution, abundance,

and habitat, to adequately define "foreseeable future."   (*See, e.g*., AR 2957, "[a]bundance

trends for the pygmy rabbit by State and throughout its range considered in this finding are

unknown."; AR 11624, Idaho researcher noting that "[i]nsufficient species distribution,

population abundance, and population trend data are available to assess [the rabbit's] true

MEMORANDUM DECISION AND ORDER

conservation status at range and region-wide scales"; AR 40185, researcher commenting

on the scarcity of baseline distribution data for the rabbit).   Most significantly, the Service

notes in several draft pygmy rabbit findings, a "more complete and accurate understanding

of the species' distribution, abundance, population trends and cycles, if any, and habitat

preferences and responses to changing environmental conditions is needed to conduct

population trend analysis and to reasonably predict foreseeable future."   (AR 2957; AR

3086.)   Although its conclusion regarding "foreseeable future" could have been more

clear, the court must "uphold a decision of less than ideal clarity" where, as here, "the

agency's path may be reasonably discerned."   *Nat'l Ass'n of Home Builders v. Defenders

of Wildlife*, 551 U.S. 644, 658 (2007).

Plaintiff also relies on two cases to support its position that failing to define

"foreseeable future" constitutes reversible error.   (Dkt. 31, pp. 7-8.)   In *Otter v. Salazar*,

2012 WL 3257843 (D. Idaho 2012) ("*Otter*") and *W. Watersheds Project v. Foss*, 2005 WL

2002473 (D. Idaho 2005) ("*Foss*"), the Idaho District Court determined the Service's

failure to articulate a species-specific definition for "foreseeable future" was arbitrary and

capricious.   *Otter* and *Foss* both involved the Service's listing determination with respect

to the slickspot peppergrass, a flowering plant found in only one place in the World, in

approximately 20,000 acres of Southwestern Idaho.   *Foss*, at *2.

In *Foss*, Western Watersheds sought judicial review of the Service's decision to

withdraw its proposed rule to list the slickspot peppergrass as endangered or threatened.

Western Watersheds challenged the Service's withdrawal as arbitrary and capricious in

MEMORANDUM DECISION AND ORDER

several respects, including the Service's failure to define "foreseeable future."   *Id.* at *14.

In the listing decision at issue in *Foss*, the Service had determined that the slickspot

peppergrass had an 82 percent chance of extinction within 100 years or less, but had only a

64 percent chance of extinction within 100 years or less with full implementation of an

intended conservation agreement.   *Id.*   Based on this information, the Service concluded

that "conservation efforts 'would reduce the expected decline in [slickspot peppergrass]

over the next few decades to the extent that the species is not likely to become endangered

in the foreseeable future.'"   *Id.*   The Court found the Service's consideration of

"foreseeable future" untenable, explaining:

Federal Defendants suggest that a prudent person would not reasonably expect that
extinction of the slickspot peppergrass would be complete within 100 years when the
evidence suggests that a 64 percent chance exists that it will occur even assuming the full
and effective implementation of the [conservation agreement].   This conclusion defies
common sense and the [Service's] own experts' conclusions and recommendations.
Simply because some conservation efforts prolong the inevitable by a mere twenty years
does not reasonably push the 'projected time when the species has a high risk of extinction
to beyond the foreseeable future' as the [Service] suggests.

*Id.* at *15.

The *Foss* Court thus reversed the listing decision not because the Service failed to

define "foreseeable future," but because the Service's definition of "foreseeable future,"

given the best scientific information from the Service's own experts, suggested that the

slickspot peppergrass *was* likely to become endangered within the next 100 years.   *Id.*

Moreover, the *Foss* Court noted that the Service had specifically instructed the risk

analysis science panel the Service consulted regarding probability of extinction, "*not* to

MEMORANDUM DECISION AND ORDER

reach a conclusion as to whether they believed slickspot peppergrass would likely become extinct within the foreseeable future." *Id*. at *16 (emphasis in original).   Further, although the Service claimed its risk management science panel had applied "general and qualitative terms" to conclude that conservation efforts postponed extinction beyond the foreseeable future, the Service could not identify what sort of "general and qualitative terms" upon which the risk management panel had relied.   *Id*. at *17.   The Court thus lacked any means to review the Service's unsupported conclusions regarding the "foreseeable future."

*Id*.   The *Foss* Court concluded:

A mere statement that the conservation agreement 'will postpone the projected time when the species has a high risk of extinction to beyond the foreseeable future,' without first delineating how the [Service] managers defined foreseeable future, does not suffice-especially when the conclusion contradicts the recommendation of its own expert…[.]
*Id*.

This case is distinguishable from *Foss* because here the Service lacked expert opinions, or other reliable scientific information, to reasonably define "foreseeable future." In addition, unlike in the listing decision at issue in *Foss*, here the record delineates the information and evidence the Service would need, but did not have, in order to define foreseeable future.   And, rather than ignoring the "best available science" in favor of a vague and non-scientific definition, as the court found it had in *Foss*, here the Service has instead made every attempt to scientifically interpret the "foreseeable future."   Given the facts of this case, the Service's conclusion that the best available science did not allow it to reliably predict the foreseeable future for the pygmy rabbit was within its discretion.

MEMORANDUM DECISION AND ORDER

Plaintiff also relies upon the Court's recent decision in *Otter*, 2012 WL 3257843 (D. Idaho 2012) to suggest the Service's failure to define "foreseeable future" was reversible error.   *Otter* involved the Service's ultimate determination, in a Final Rule published after several rounds of litigation, that the slickspot peppergrass *should* be listed as endangered or threatened.   In the Final Rule at issue in *Otter*, the Service defined "foreseeable future," as "that period of time over which events can reasonably be anticipated."   *Id*. at \*18.   The Court found this definition was impermissibly vague and generic and vacated the Final Rule on this issue.   *Id*. at \*19-20.   In so holding, the Court found both the Solicitor's *M-Opinion* and *Foss* require that the "definition of foreseeable future…be made on a species-by-species basis," based on a thorough "analysis of the time frames applicable to the particular species at issue."   *Id*.

In finding the Service was required to define "foreseeable future," however, the *Otter* Court stressed that the Service was "not without guidance" on the issue.   *Id*. at \*19. For instance, the Service's experts had recommended that the "foreseeable future" timeframe for the slickspot peppergrass should be 60 to 100 years.   *Id*. (*citing Foss*, at \*6). Similarly, in a subsequent case involving the slickspot peppergrass, the Service's panel defined the foreseeable future as "not greater than 40 years based on the species' biology, habitat threats, and other factors."   *Id*.   As the *Otter* Court noted, the Service had "been provided multiple definitions of 'foreseeable future' by multiple scientists and groups of scientists throughout the listing process involving the slickspot peppergrass."   *Id*.   In

MEMORANDUM DECISION AND ORDER

light of the extensive scientific information available in *Otter*, the Service's vague and arbitrary definition of "foreseeable future" constituted reversible error.

Rather than relying on a vague and generic definition of "foreseeable future" in this case, the Service instead attempted to delineate a species-specific and scientific definition of the foreseeable future for the pygmy rabbit.   Unlike in *Otter*, here the record illustrates that the Service considered potential species-specific definitions of foreseeable future, such as ten years (roughly three pygmy rabbit generations), but determined that such definitions represented only a default time period, not grounded in science.   (AR 2957-8.)

Further, unlike in *Otter*, the Service did not here ignore a bevy of scientific evidence in favor of a vague definition of "foreseeable future," but instead concluded an appropriate species-specific definition of "foreseeable future" was not possible given the available evidence.   Because Congress has mandated that the Service must base its listing decision "solely on the basis of the best scientific and commercial data available," this Court finds the Service's reasoned conclusion with respect to "foreseeable future" cannot be considered reversible error.   16 U.S.C. § 1533(b)(1)(A); *see also Trout Unlimited v. Lohn*, 645 F.Supp.2d 929, 947 (D.Or. 2007) (noting an agency must use the best available science to make a "foreseeable future" determination, and that this "does not require the agency to 'give the benefit of the doubt to the species' if the data is uncertain or inconclusive).[5]

---

5 In *Trout*, the Court further noted that under Section 4 of the ESA, the:
…default position for all species is that they are not protected under the ESA.   A species receives the protections of the ESA only when it is added to the list of threatened species after an affirmative determination that it is 'likely to become endangered within the foreseeable future.'
MEMORANDUM DECISION AND ORDER

Finally, Plaintiff argues the Service has acknowledged "substantial geographic overlap" between the habitat for the pygmy rabbit and that for the Greater sage grouse, that many of the same threats thus impact the continued existence of both species, and that the Service could have extrapolated threat trends for the pygmy rabbit as it had no difficulty extrapolating threat trends to define "foreseeable future" in its listing decision for the sage grouse.  (Dkt. 46, p. 8.)   However, "different species may differ in adaptability" to threats, and decisions involving other species should not be relied upon to show the Service was arbitrary and capricious in a particular instance.  *Ctr. for Biological Diversity v. Lubchenco*, 758 F.Supp.2d 945, 967 (N.D. Cal. 2010); *see also Ctr. for Native Ecosystems v. U.S. Fish and Wildlife Serv*ice, 795 F.Supp.2d 1199, 1205 (D. Colo. 2011) (relevancy of decisions involving a different species in the same general location is "at best attenuated.").

As the Service notes, an evaluation of threats depends on habitat preferences and species-specific characteristics.  (Dkt. 39, p. 25, n. 8.)   Both the sage grouse's habitat range and its response to threats are different from that of the pygmy rabbit, and thus the Service could not simply define "foreseeable future" for the pygmy rabbit based on its assessment of "foreseeable future" for the sage grouse.  (Dkt. 40, p. 4, ¶8.)

---

Although an agency must still use the best available science to make that determination…[this does not]… require an agency to 'give the benefit of the doubt to the species' if the data is uncertain or inconclusive.  Such a reading would require listing a species as threatened if there is any possibility of it becoming endangered in the foreseeable future.  This would result in all or nearly all species being listed as threatened.  Instead, Congress vested the [agency] with discretion to make listing decisions based on consideration of the relevant statutory factors using the best scientific information available.

*Id*.

MEMORANDUM DECISION AND ORDER

The Service considered the best scientific evidence available to it and determined that such evidence does not show the pygmy rabbit is likely to become endangered within the foreseeable future.   In reaching this conclusion, the Service determined that the pygmy rabbit not only continues to occur generally throughout its historical range, but that it also occurs in previously unknown or undocumented areas.   (AR 16.)   The Service also determined that, despite the various threats to the pygmy rabbit habitat, the rabbit continues to persist.   (AR 43-4.)   The Service's reasoned determination the pygmy rabbit is not likely to become endangered in light of such findings is entitled to deference.   And, although the best information available did not allow the Service to define "foreseeable future," the Service was not required to conduct further tests.   *American Wildlands v. Kempthorne*, 530 F.3d 991, 998 (D.D.C. 2008).   Failure to define "foreseeable future" constitutes reversible error where the available scientific information allows for such definition.   However, given Congress' mandate that a listing decision must be based "*solely* on the basis of the best scientific and commercial data available," the Service's inability to define "foreseeable future" in this case cannot be considered arbitrary or capricious.   16 U.S.C. § 1533(b)(1)(A) (emphasis added).

### 3.  Significant Portion of Range Analysis

#### a.  *The Service's Interpretation of Significant Portion of Range*

Under the ESA, a species must be listed as endangered or threatened if it warrants protection "*throughout all or a significant portion of its range*[.]" 16 U.S.C. § 1532(6), (20) (emphasis added).   "The ESA does not define what constitutes a species' 'range,' nor

MEMORANDUM DECISION AND ORDER

what is considered 'significant.'"   *Colorado River Cutthroat Trout v. Salazar*, 898

F.Supp.2d 191, 201 (D.D.C. 2012).   The Ninth Circuit has determined the phrase

"throughout all or a significant portion of its range," is "inherently ambiguous."

*Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1141 (9th Cir. 2001) (hereinafter

"*Defenders*").     Because the phrase is ambiguous, the Service has a wide degree of

discretion in determining whether the pygmy rabbit is in danger "throughout a significant

portion of its range."   *Id*. at 1145; *see also Chevron*, 467 U.S. at 843-44 (if the statute is

ambiguous with respect to a specific issue, then the court must defer to the agency's

interpretation unless that interpretation is unreasonable).

Plaintiff argues the Service abandoned its "historic, science-based test" for

interpreting significant portion of range in the Listing Decision, and that the Service

instead employed a novel and, ultimately deficient, new test.   (Dkt. 31, pp. 1, 8-9.)

Plaintiff contends the Service's Listing Decision is arbitrary and capricious because the

Service failed to articulate any reasoned explanation to support its change in position, and

because the Service's new significant portion of range test would preclude any habitat from

being considered significant.   (*Id*. at 11) *(citing Nat'l Wildlife Federation v. Nat'l Marine

Fisheries Service*, 524 F.3d 917, 928 (9th Cir. 2008) (agency's novel interpretation of a

statutory term that is "completely at odds with [the agency's] prior scientific

approaches…merits little deference.")).     Defendants counter that the Service utilized its

traditional test for interpreting significant portion of range with respect to the pygmy

rabbit, and that the pygmy rabbit listing decision simply eliminated some of the

MEMORANDUM DECISION AND ORDER

"boilerplate language" traditionally used to define significant portion of range in past listing decisions.   (Dkt. 39, p. 4; Dkt. 41, p. 10.)   Because there was no substantive change to the Service's significant portion of range analysis, Defendants suggest no explanation for the alleged "new test" was necessary.   (Dkt. 39, p. 8; Dkt. 41, p. 1.)

In *Defenders*, the Ninth Circuit determined a species can be threatened or extinct "'throughout…a significant portion of its range' if there are major geographical areas in which it is no longer viable but once was."   *Defenders*, 258 F.3d at 1145-46 (reversing summary judgment in favor of Service and remanding the Service's decision because it failed to explain how a thirty-four percent reduction in a species' historical range was not a significant portion of the flat-tail horned lizard's range).   Here, having determined that the pygmy rabbit is not endangered or threatened throughout all of its range, the Service considered whether the pygmy rabbit is endangered or threatened in a significant portion of its range.   (AR 45.)   The Service found the pygmy rabbit range in Oregon, Idaho, Montana, Nevada and Utah did not warrant further consideration to determine if they constituted a significant portion of the pygmy rabbit's range.   The Service did, however, find that the Mono County, California portion and the Wyoming portion of the pygmy rabbit's range warranted further significant portion of range analysis.   (*Id*.)   Although Plaintiff assigns error to both of these conclusions (*see, infra*, section 3.b), it is the Service's conclusion that the Mono County, California and Wyoming portions of the pygmy rabbit range did not constitute significant portions of the pygmy rabbit's range to which the Court now turns.

MEMORANDUM DECISION AND ORDER

The Service's traditional test for determining significant portion of range first considers whether there are any areas within a species' range where threats are "geographically concentrated," thus warranting further review to determine whether these areas are significant.   (AR 45); *see also* (Dkt. 46, p. 10, *Plaintiff's Combined Reply Brief in Support of its Motion for Summary Judgment*, stating "[t]he elements of the Service's historic approach to determining [significant portion of range] are not in dispute.   Under the historic approach, the Service first assesses whether any threats are 'geographically concentrated' in some areas, thus warranting further review to determine whether these areas constitute a 'significant portion of range.'").   If threats are uniform throughout the range and are significant enough to warrant listing, then a significant portion of range analysis is not required because the Service would have already determined that the species is endangered or threatened *throughout* its range.[6]   The Service thus only undertakes an significant portion of range analysis, where, as in this case, it has first determined the species at issue is not endangered or threatened throughout its range.

Plaintiff and Defendants also agree that the Service's traditional significant portion of range analysis has considered whether a particular area where threats are concentrated "is important to the conservation of the species because it contributes meaningfully to the representation, resiliency, or redundancy of the species."   *See, e.g.*, (Dkt. 31, p. 9; Dkt. 39,

---

6  As previously mentioned, the term "endangered species" means any species which is "in danger of extinction throughout all *or* a significant portion of its range," while a "threatened species means any species which is likely to become an endangered species within the foreseeable future throughout all *or* a significant portion of its range." 16 U.S.C. § 1532(6), (20) (emphasis added).

MEMORANDUM DECISION AND ORDER

pp. 3-4; Dkt. 41, pp. 4-5).   These factors represent "three principles of conservation biology that are generally recognized as being necessary to conserve the biodiversity of the area."   *See Final Rule to Reclassify and Remove the Gray Wolf from the Endangered and Threatened Wildlife in Portions of the Conterminous United States*, 68 Fed.Reg. 15804, 15809 (Apr. 1, 2003); *see also* (AR 4680.)   In general:

Adequate representation ensures conserving the breadth of the genetic makeup of the species needed to conserve its adaptive capabilities…. Resilience refers to the ability of a species to recover from periodic disturbances or environmental variability…a species is usually most resilient in highest quality habitat. Redundancy of populations is needed to provide a margin of safety for the species to withstand catastrophic events.

*Proposed Rule to List the British Columbia Distinct Population Segment of the Queen Charlotte Goshawk Under the Endangered Species Act*, 74 Fed.Reg. 56757, 56766 (November 3, 2009).

The Service has relied upon the representation, resilience and redundancy analysis ("3-R Test") to determine whether an area is a significant portion of a species' range in listing decisions since 2003.   *See, e.g*., 68 Fed.Reg. 15804, 15809 (Apr. 1, 2003) (Gray Wolf); 73 Fed.Reg. 12929, 12940-41 (March 11, 2008) (N. American wolverine); 74 Fed.Reg. 63343, 63365 (Dec. 3, 2009) (Black-tailed prairie dog); 75 Fed.Reg. 6438, 6468-70 (Feb. 9, 2010) (American pika); 75 Fed.Reg. 54822, 54837 (Sept. 9, 2010) (Jemez Mountains Salamander).    However, the 3-R Test is not derived from the ESA, an ESA implementing regulation, or any Service or Department of Interior policy.   (Dkt. 39, p. 3; Dkt. 41, pp. 5-6.)

MEMORANDUM DECISION AND ORDER

Although Plaintiff notes that the Service utilized the 3-R Test in at least 17 drafts of the pygmy rabbit Listing Decision, Plaintiff claims the Service abruptly abandoned the 3-R Test and applied an entirely new significant portion of range analysis in the Listing Decision itself.   (Dkt. 31, p. 10.)   Defendants counter that the Service considered the substance of the 3-R Test factors when analyzing whether certain areas constituted a significant portion of the pygmy rabbit's range, but simply removed the signpost terms "resiliency," "redundancy," and "representation" from the Listing Decision.   (Dkt. 39, p. 4; Dkt.   41, p. 7.)

The Court finds that although the Listing Decision omitted the terms "resiliency," "redundancy," and "representation," it did not substantively alter the significant portion of range analysis.   For instance, the Service determined the Mono County, California population warranted further consideration to determine whether it was a significant portion of the pygmy rabbit range due to the possible lack of connectivity to pygmy rabbit populations in Nevada, which would increase the threat of population isolation.   (AR 45.) The Service selected the Wyoming portion due to the concentration of energy exploration and development in Wyoming, and the corresponding possible threat from these activities to the pygmy rabbit.   (*Id*.)   Because threats were potentially concentrated in Mono County, California and Wyoming, the Service properly identified these areas as warranting further significant portion of range analysis.

To assess whether Mono County and Wyoming were significant portions of the pygmy rabbit's range, the Service evaluated:

MEMORANDUM DECISION AND ORDER

[W]hether these two areas occupy relatively large or particularly high-quality, unique habitat that could be affected, or if their locations or characteristics make them less susceptible to certain threats than other portions of the species' range such that they could provide important population refugia in the event of extirpations elsewhere in the species' range.

(*Id.*)

The Service determined that "the Mono County populations occupy less than 1 percent of the species range, and the available information does not suggest that the habitat occupied by pygmy rabbits is particularly high quality or unique when compared to the remainder of the range." (*Id.*)   The Service found that the Wyoming "populations occupy about 11.5 percent of the species range, and available information does not suggest that the habitat occupied by pygmy rabbits is particularly high quality or unique when compared to the remainder of the range." (*Id.* at 46.)   In addition, the Service did not find that the Mono County or Wyoming populations "are less susceptible to certain threats than other portions of the range." (*Id.* at 45-46.)   Finally, the Service also evaluated "the historical value" of the Mono County and Wyoming portions of the pygmy rabbit's range, the "frequency" of use of these portions by the rabbit, and whether these portions "contain[ed] important concentrations of certain types of habitat that are necessary for the species to carry out its life-history functions, such as breeding, feeding, migration, dispersal, or wintering." (AR 46.)   The Service determined these necessary habitats were not concentrated in either Mono County or Wyoming. (*Id.*)

As the Service explained in its listing decision for the Morelet Crocodile:

MEMORANDUM DECISION AND ORDER

Resiliency of a species allows the species to recover from periodic disturbance. A species will likely be more resilient if large populations exist in high-quality habitat distributed throughout the range of the species in such a way as to capture the environmental variability found within the range of the species. It is likely that the larger size of a population will help contribute to the viability of the species overall. Thus, a portion of a range of a species may make a meaningful contribution to the resiliency of the species if the area is relatively large and contains particularly high-quality habitat or if its location or characteristics make it less susceptible to certain threats than other portions of the range. When evaluating whether or how a portion of the range contributes to the resiliency of the species, it may help to evaluate the historical value of the portion of the range and how frequently the portion is used by the species. In addition, the range may contribute to the resiliency for other reasons—for instance, it may contain an important concentration of certain types of habitat that are necessary for the species to carry out its life history functions, such as breeding, feeding, migration, dispersal or wintering.

76 Fed. Reg. 23650, 23676 (Apr. 27, 2011).

As demonstrated above, the Service's significant portion of range analysis considered the substantive resiliency factors in the Listing Decision, but simply omitted the term "resiliency."

Further, in addition to Mono County and Wyoming, the Service determined the "pygmy rabbit…occurs in sagebrush habitats located in southeastern Oregon, southern Idaho, southwestern Montana, western Utah, and northern and eastern Nevada."   (AR 46.) The Service also determine the pygmy rabbit is distributed throughout its range in new areas where it was not previously located.   (*Id.*, pp. 12, 13).   The Service's significant portion of range analysis thus took into account redundancy, or whether having multiple distributions across the landscape may be needed to provide a margin of safety for the species to withstand catastrophic events.   As the Service explained in listing decision for the Morelet's Crocodile:

MEMORANDUM DECISION AND ORDER

Redundancy of populations may be needed to provide a margin of safety for the species to withstand catastrophic events. This does not mean that any portion that provides redundancy is a significant portion of the range of the species. The idea is to conserve enough areas of the range such that random perturbations in the system act on only a few populations. Therefore, each area must be examined based on whether that area provides an increment of redundancy that is important to the conservation of the species.

76 Fed. Reg. 23650, 23676 (Apr. 27, 2011):

Because the Service determined the pygmy rabbit has multiple distributions throughout its traditional range, it reasonably concluded the Mono County and Wyoming portions of the pygmy rabbit population did not contribute to the redundancy of the species. (AR 45-46).   Finally, the Service did not include a discussion of the representation factor in the Listing Decision because there was no evidence that the Mono County or Wyoming populations differed markedly from other pygmy rabbit populations in genetic characteristics, and there was no genetic information to consider.[7]   (AR 45.)

Thus, the Listing Decision itself illustrates that the Service considered the substance of the 3-R Test when considering whether Mono County and Wyoming represented a significant portion of the pygmy rabbit's range.   The record is also replete with references to the Service's consideration of resiliency, redundancy and representation.   *See, e.g.*, R76344 (June 15, 2010 Draft Pygmy Rabbit Finding) (noting that the 3R's are "indicators" of an area's conservation value); R76347 (discussing Service's analysis of redundancy

---

[7] The Service's inability to further evaluate representation due to a lack of genetic data was not in error where such data did not exist.   As previously noted, the Service must consider the best available science, and is not required to conduct independent studies in cases where there are insufficient data.   *American Wildlands v. Kempthorne*, 530 F.3d 991, 998 (D.C. Cir. 2008).

MEMORANDUM DECISION AND ORDER

factor with respect to pygmy rabbit); R76348 (discussing Service's analysis of representation factor with respect to pygmy rabbit).

Indeed, Plaintiff admits that the Service utilized the 3-R Test in at least 17 drafts of the Listing Decision.   (Dkt. 31, p. 10.)   Plaintiff's claim that the Listing Decision is arbitrary and capricious because it abandoned the 3-R Test is meritless when it is apparent from both the Listing Decision and the record that the Service evaluated the 3-R Test factors.   The Service's significant portion of range analysis with respect to the pygmy rabbits is thus not "novel," and the Service did not reverse its policy.   As such, Plaintiff's claim that the Service's decision was arbitrary and capricious because the Service failed to explain its change in policy also fails.   The Service did not change its policy and no explanation was required.

Because the Service has provided a reasoned explanation for its significant portion of range methodology, the Court will not second-guess its conclusion that Mono County and Wyoming did not represent a significant portion of the pygmy rabbit's range. *Colorado River Cutthroat Trout v. Salazar*, 898 F.Supp.2d 191, 209 (D.D.C. 2012); *see also Fund for Animals v. Babbitt*, 903 F.Supp. 96, 114 (D.D.C. 1997) ("Judicial 'deference to the agency is greatest when reviewing technical matters within its area of expertise, particularly its choice of scientific data and statistical methodology.'") (citation omitted).

Moreover, even if the Service did not adequately perform the 3-R Test, as Plaintiff suggests, a listing decision cannot be overturned based on the Service's alleged noncompliance with its own, nonbinding policy statements.   *Building Indus. Ass'n of*

MEMORANDUM DECISION AND ORDER

*Superior Caifornia v. Babbitt*, 979 F.Supp. 893, 905 (D.D.C. 1997).   In its *Combined*

*Reply in Support of its Motion for Summary Judgment*, Plaintiff admits that the Service

considered some of the traditional 3-R Test factors, but claims the Service omitted the

majority of elements traditionally considered under the 3-R Test.   (Dkt. 46, p. 10.)

Because the 3-R Test is not derived from the ESA, an ESA implementing

regulation, or any Service or Department of Interior policy, the 3-R Test is not substantive

rule which can be enforced against the Service.   The "touchstone of enforceability [of an

agency rule or statement] is agency intent…[T]he binding quality of a particular rule or

statement will depend on whether the agency intended to establish a substantive rule, one

which is not merely interpretive but which creates or modifies rights that can be enforced

against the agency."   *Babbitt*, 979 F.Supp. at 905 (*quoting Jackson v. Culinary School of*

*Washington*, 27 F.3d 573, 584 (D.C. Cir. 1994).   Here the Service has not issued any

policy statements with respect to use of the 3-R Test to define significant portion of range,

let alone a binding statement requiring use of the test, and has instead simply relied upon

the test in the past as a helpful method to evaluate whether a particular area is a significant

portion of a species' range.   Thus, even if the Service departed from the 3-R Test in

evaluating the significant portion of range with respect to the pygmy rabbit, such departure

could not be considered arbitrary and capricious.[8]

---

8  Although, if the Service had departed from the 3-R Test, it would be required to explain its
change in direction given its history of using the 3-R Test.   *Nat'l Cable & Telecommunications*
*Ass'n v. Brand X Internet Services*, 545 U.S. 967, 980 (2005).   Because the Court finds the

MEMORANDUM DECISION AND ORDER

Finally, Plaintiff claims the Services "new" significant portion of range test is inconsistent with the ESA because it renders the significant portion of range concept superfluous.   (Dkt. 31, p. 15.) The Court need not address this argument because it has determined that the Service did not apply a new test, and that the Service considered the very elements Plaintiff faults it for omitting.

   b.  *Range contraction*

Plaintiff also assigns error to the Service's significant portion of range analysis because the Service "never considered whether the areas where pygmy rabbits no longer occupy constitute a significant portion of its range."   (Dkt. 31, p. 17.)   As the Ninth Circuit held in *Defenders*, "where…it is on the record apparent that the area in which the [species] is expected to survive is much smaller than its historical range, the Secretary must at least explain her conclusion that the area in which the species can no longer live is not a 'significant portion of its range.'"   258 F.3d at 1145.   Plaintiff claims the record illustrates that the pygmy rabbit no longer occupies vast areas within its historic range, especially in Idaho, Utah and Oregon, yet the Service never considered whether these areas constitute significant portions of the pygmy rabbit's range.   (Dkt. 31, p. 17.)

Contrary to Plaintiff's contention, the record does not show that the area where the pygmy rabbit is expected to live is "much smaller than its historical range."   *Defenders*, 258 F.3d at 1145.   Instead, the evidence in the record and the Listing Decision illustrates

---

Service substantively considered the 3-R Test factors when evaluating the significant portion of range, an explanation is not here required.

MEMORANDUM DECISION AND ORDER

that the pygmy rabbit is distributed throughout its historic range, as well as in new areas where it was not historically located.   (AR 12, 13, 43-44).   Plaintiff claims certain studies within the record suggest the pygmy rabbit has instead suffered severe range contraction. (Dkt. 31, pp. 17-20.)   However, the Service evaluated thousands of data points for Idaho, Montana, Nevada, Oregon, and Utah, as well as a host of additional evidence within the record, to conclude that pygmy rabbits remain active throughout their historical range. *See, e.g.*, AR 8-11; AR18220-19050 (Idaho distribution data consisting of 4051 reliable records, 3937 of which are post-2000); AR20659-20889 (Montana distribution data consisting of 956 reliable records, 656 of which are post-2000); AR21091-21958 (Nevada distribution data consisting of 1360 reliable records, 1210 of which are post-2000); AR23682-24043 (Oregon distribution data consisting of 419 reliable records, 363 of which are post-2000); AR24199-24392 (Utah distribution data consisting of 847 reliable records, 741 of which are post 2000).   The Service compared distribution data from the 1870s to 1999, which it used to identify historical range, with distribution data from 2000-2008, which it used to evaluate current range, and reasonably determined the data showed the pygmy rabbit has suffered little to no range contraction.   (AR 4-15.)

The rationale for deference "is particularly strong when the [agency] is evaluating scientific data within its technical expertise."  *American Wildlands v. Kempthorne*, 530 F.3d 991, 1000 (D.C. Cir. 2008) (internal quotation and citations omitted).   Further, "in an area characterized by scientific uncertainty" the court must "proceed with particular caution, avoiding all temptation to direct the agency in a choice between rational

MEMORANDUM DECISION AND ORDER

alternatives." (*Id*.)   To the extent Plaintiff asks this Court to find that the Service drew improper conclusions from the scientific information it considered, the Court declines to do so.   The Court finds that the Service acted within its discretion to weigh the available facts and scientific information before it.   *North Plains Resource Council, Inc. v. Surface Transp. Bd*., 668 F.3d 1067, 1075 (9th Cir. 2011) ("The court is not to 'act as a panel of scientists that instructs the [agency]" or "chooses among scientific studies.").   The Service was entitled to weigh the scientific evidence regarding range contraction and the Service's conclusion that the pygmy rabbit has not lost vast areas of its historical range cannot be considered arbitrary and capricious.

Finally, Plaintiff suggests the Service failed to comply with this Court's Order that it consider whether the habitat loss and reduced geographic range of the pygmy rabbit constitute a significant portion of its range under *Defenders*. (Dkt. 31, p. 19) (*citing* W. *Watersheds Project v. Norton*, 2007 WL 2827375 (D. Idaho 2007), at *7)) ("*Norton*"). Plaintiff mischaracterizes this Court's order.

In *Norton*, the Court remanded the Service's 90-day Finding denying Plaintiff's Listing Petition because the Court found the Service had improperly imposed a higher standard on Plaintiff than the "substantial information" threshold statutorily required at the listing petition stage of review.[9]   *Norton*, at *6.   Plaintiff had also argued in *Norton* that

_____

9  "What is required at this stage of the listing process, however, is a review of the Petition for a determination of whether it presents substantial information indicating to a reasonable person that the petitioned action may be warranted.   This standard is in 'contrast to the best scientific and

MEMORANDUM DECISION AND ORDER

the Service failed to consider the status of the pygmy rabbit across a significant portion of its range, as required under *Defenders*, when it denied Plaintiff's Listing Petition.   *Id*. at *7.  This Court noted that the "facts of this case are distinct from those in *Defenders*" because the Service had, at the time the Court issued its decision, yet to reach the conclusion of whether there are major geographical areas in which the pygmy rabbit was no longer viable but once was.   *Id*.   The Court remanded the Listing Petition to the Service to apply the appropriate "substantial information" threshold, and directed that "*if necessary based on the Service's findings on remand*, the Service…consider [significant portion of range] as directed in *Defenders*."   *Id*.   (emphasis added).   Plaintiff's argument omits the "if necessary" language from the *Norton* finding.   Because the Service ultimately concluded that there are not major geographical areas in which the pygmy rabbit is no longer viable but once was, it was not required to assess the significant portion of range analysis under *Defenders*.   As noted, the Service's conclusion that the pygmy rabbit has not suffered range contraction is based on the best available scientific evidence and is not arbitrary and capricious.

### 4.  Combined Threats

Finally, Plaintiff also argues that, though the Service considered the statutorily mandated threat factors set forth in 16 U.S.C. § 1533(a)(1) on an individual basis, the Service failed to consider the cumulative or combined impact of all of the factors as

---

commercial data standard' applied to actually listing a species" and does not require "conclusive evidence."   *Id*., at *5 (citations omitted).

MEMORANDUM DECISION AND ORDER

required under 50 C.F.R. § 424.11(c).   The Service is required to list a species if it

determines that "any one or a combination of" the listing factors has caused the species to

be endangered or threatened.[10]   50 C.F.R. § 424.11(c); *see also Carlton v. Babbitt*, 900

F.Supp. 526, 530 (D.D.C. 1995) (stating the Service "must consider each of the listing

factors singularly *and in combination* with the other factors.") (emphasis added).

Defendants contend that the Service considered the effects of potential threats both

individually and collectively.   Defendants argue that, although the Listing Decision did

not contain a separate section discussing the cumulative effect of the threats to the pygmy

rabbit, the Service necessarily considered the combined effect of threats because a number

of such threats overlap.   For instance, the Service could not consider habitat fragmentation

in isolation because other Factor A threats, such as agricultural conversion, livestock

grazing, and energy exploration, may increase habitat fragmentation.   (Dkt. 39, p. 24,

*citing* AR 19-20, 29.)   Because a number of threats overlap, Defendants argue the

Service's consideration of the combined effect of threats was necessarily included within

the Service's discussion of each individual threat.

---

10  Both Plaintiff and Defendants limit their "combined threats" analysis to threats that fall under
Factor A of 16 U.S.C. § 1533(a)(1)(A), or the "present or threatened destruction, modification, or
curtailment of its habitat or range."   In its *Memorandum in Support of its Cross-Motion for
Summary Judgment*, the Service noted that the Service had evaluated Listing Factors B-E, and
determined such factors were insignificant.   (Dkt. 33, p. 12.)   Defendant also noted that
Plaintiff's Complaint challenged only the Service's assessment of Factor A, and not any of the
remaining Listing Factors.   *Id*.   In its summary judgment briefing, Plaintiff does not dispute that
its challenges to the Listing Decision are limited to the Service's conclusion with respect to Factor
A, and does not challenge the Service's decision with respect to Factors B-E.   The Court's
analysis of "combined threats" is accordingly generally limited to the Service's assessment of
Factor A threats.

MEMORANDUM DECISION AND ORDER

The Listing Decision illustrates that the Service considered the relationship between various threats to the pygmy rabbit's habitat and population.   For instance, the Service noted that livestock grazing is the most widespread use of land across sagebrush communities, and thus ultimately contributes to habitat fragmentation for the pygmy rabbit.   (AR 21).   The Service determined that proliferation of noninvasive nonnative plant species increases the risk of lost habitat due to fire and corresponding replacement of native grasses and shrubs.   (AR   23-25.)   The Service also considered how fire, urban and rural development, and mining, among other threats, each overlap and contribute to the loss of sagebrush habitat appropriate for the pygmy rabbit.   (AR 19-31).

The Service also considered that various threats, such as fire, inevitably increase the prevalence of other threats, such as the proliferation of cheatgrass.   (AR 25).   The Service also considered Factor A threats in combination with other potential threats throughout the Listing Decision.   For example, the Listing Decision considered fire in combination with predation (Factor C) and climate change (Factor E).   (AR 26, 40-41.)   The Listing Decision also considered cheatgrass and other invasive plant species in combination with predation (Factor C); federal laws and regulations (Factor D); and climate change (Factor E).   (AR 24, 37, 40-41.)   Further, the Listing Decision considered energy development in combination with federal laws and regulations (Factor D), as well as habitat fragmentation in combination with agricultural conversion (Factor A).   (AR 32, 37.)

Thus, the Service's analysis of how the Listing Factors interact and combine together is apparent in the Listing Decision.   Unlike in the cases cited by Plaintiff, the

MEMORANDUM DECISION AND ORDER

Court finds that the Service did consider the Listing Factors both singularly and in combination with other factors.   (Dkt. 31, pp. 21-22.)   As the District of Columbia District Court determined in *Colorado River Cutthroat Trout v. Salazar*, 898 F.Supp.2d 191 (D.C. Cir. 2012), the Service "certainly could have been more explicit in articulating the manner in which it considered how factors might combine together to intensify or mitigate threats" and could have outlined "its analysis of combined effects in a separate section."   *Id*. at 206.   Nevertheless, because, like the decision at issue in *Salazar*, the Service's consideration of the combined effect of threats "can be reasonably discerned" in this case, the Service did not fail to consider the listing factors in combination.   *Id*. (*citing Building Indus. Ass'n of Superior California v. Babbit*, 979 F.Supp. 893, 898.[11]

## 5.  Conclusion

In sum, Plaintiff has not shown that the Service acted in an arbitrary and capricious manner, abused its discretion, or otherwise acted in violation of the ESA in concluding that listing the pygmy rabbit as "threatened" or "endangered" is not warranted at this time. The Court finds that the Service has adopted a reasonable interpretation of the statute, has provided adequate explanations for its decision, and that the record supports the Service's factual findings and methodological choices.   For the reasons set forth above, the Court

---

11  Plaintiff also maintains that the Service previously recognized the cumulative effect of threats in the Greater sage grouse listing decision, that the same threats are relevant to the pygmy rabbit given the common habitat shared by both species, and that the Service's treatment of such threats as distinct is thus not credible in this case.   (Dkt. 31, p. 24.)   To the extent the sage grouse listing is relevant (*see supra*, p. 29), however, the record illustrates that the Service has not treated threats as distinct, and has instead considered the relationship between threats, such as the relationship between fire and cheatgrass.

MEMORANDUM DECISION AND ORDER

GRANTS Defendants' Motions for Summary Judgment and DENIES Plaintiff's Motion

for Summary Judgment.

## ORDER

**IT IS ORDERED:**

1. Plaintiff's Motion for Summary Judgment (Dkt. 30) is **DENIED**,

2. Defendant s Daniel Ashe and United States Fish and Wildlife Service's Motion

   for Summary Judgment (Dkt. 33) is **GRANTED**, and

3. Defendant-Intervenor 's Motion for Summary Judgment (Dkt. 27) is

   **GRANTED**.

4. Judgment consistent with this Memorandum Decision and Order shall be

   entered in favor of Defendants and Defendant-Intervenor.

DATED: June 4, 2013

Edward J. Lodge
United States District Judge

MEMORANDUM DECISION AND ORDER